We'll hear argument first this morning in case 1674, Advocate Health Care Network v. Stapleton and the consolidated case. Ms. Blatt? Thank you, Mr. Chief Justice, and may it please the Court. Pension plans for religious non-profits have been exempt from ERISA for over 30 years, whether or not a church established the plan. The contrary holding of the three courts below should be reversed for three reasons. First, the text does not require a church to establish benefit plans for someone else's employees. Second, the government's consistent view over three decades has generated enormous reliance, interest, and warrants deference. And third, affirmance would resurrect the precise problems that everyone understood the 1980 amendment would fix. I could start with the text, and the main text at issue here is subparagraph C-1 of section 1002-33. And if you the government's brief actually has all the relevant provisions, so I think that's the easiest if you want to look at their appendix. And C-1 is reprinted on pages 11A. So again, we're looking at subparagraph C-1 of paragraph 33, which everyone in this case agrees expands the original church plan definition in subparagraph A. Now, the only plausible reason that C-1 repeats the entire phrase, a plan established and maintained by a church, is Congress intended that C-1 redefine and modify that entire phrase. Why? There was a provision that was proposed that would have done very clearly what you think this provision does now, and Congress didn't pass it. So an earlier version did exactly what you wanted. It said you can have a plan that establishes and or maintained by a church. It said established and maintained, and the problem, Justice Sotomayor, is that the assumption is incorrect that that provision did everything that folks wanted. It actually didn't. It excluded the very plans that everyone concedes was intended to be covered. The pension plans. Well, plans established by churches and maintained by somebody else. A plan established and maintained by a church includes a plan established and maintained by a church-affiliated organization. Right. And that would have excluded... Who? It would have excluded plans that were the church established and the pension board maintained. And the other side... I'm sorry. A plan established and maintained by a church. Maintained. So that's any plan established by... This is the old language, by the way, Sue. Right. So here... But that's any church plan, plus it defined includes a plan established and maintained by a church-affiliated organization. Why is it not a pension plan? Because the problem is that provision, the way it read, required the pension board to not only maintain it, but it would have had to establish it. And so that excluded... A plan established and maintained by a church-affiliated organization. Right. But it said and. And so if the church established it, then it wouldn't have been a church plan established and maintained by a church, and it wouldn't have been a plan established and maintained by a pension board. And I think the clear thing in terms of this un-interrupt... I mean, this un-passed piece of legislation is it came out in the last couple of days of this several-year process, and the change went unmentioned, Justice Sotomayor. And it's just implausible that that change went unnoticed when it would have excluded all the plans that the religious community was up in arms about and all the plans that prompted the amendment in the first place. Still, Ms. Lutt, there is a... You know, there would be a simple way of accomplishing what you think this provision accomplishes. You know, something along the lines of just saying any plan maintained by a church-affiliated organization is a church plan or something like that. It's very odd language, this statutory language. And I'm wondering why you think that Congress chose to do what you think it chose to do in this perplexing way rather than in a straightforward way. Sure. I don't find it that perplexing. When your version would have messed up when you tried to put it all in 33A, it would have... redefined all of A, which had a second compound definition of it had to be a tax exempt under Section 501. But, Justice Kagan, let me cut to the chase here. If I had started from scratch, I don't know if I could have done this better. I doubt it, because it's so complicated. But let's look at what actually happened in 1974 and how just how different C itself looks, because, remember, they started in 1974 and there was an A and there was a subparagraph C, and now we still have subparagraph C. So they were working with an existing apparatus. Now, old subparagraph C itself expressly required the church to establish C plans. And these C plans had to include the church's own actual employees. And Congress did two huge things in paragraph C now. It eliminated not only the express church establishment requirement, but the very reason for that requirement in the first place, namely that these plans include the church's own employees. So what we have now today, and I don't think this is disputed, we know, the one thing we do know is that C1 plans can be maintained wholly and completely and absolutely outside the church and can include solely, completely, and wholly outside the church all the employees of any tax-exempt religiously affiliated employer. So it just defies both common sense and our background understanding under ERISA to require the church to establish someone else's benefit plans when we know employers are usually the ones who set the employment benefits for their own employees. Ginsburg. Another problem with your reading, this C1 seems to be predominantly about principal purpose organizations. And I think the Respondent suggests that you would like it to read, as reproduced on page 27 of their brief, you would like it to say, includes a plan maintained by an organization controlled by or associated with a church. But this provision seems to be giving authority to principal purpose organizations and not to entities controlled by or associated. Right. Well, you're absolutely right, except for the point about how I would like it to read, because we like the way it reads now. What this does is it, and there's no question that our reading gives independent meaning to principal purposes organization. We can see that an absolute full requirement is that the plan must be maintained by an organization, whether external or internal, that has its principal purpose, the administration or funding of a plan. But, Justice Ginsburg, the definition of a principal purpose organization includes a plan for any employee of a church. An employee of a church is defined expressly in C2 to mean any employee not of a church, namely any church-affiliated tax-exempt organization. So whether it's a pension board that's either sitting in the hospital or a religious charity, or it's a pension board that's externally incorporated, Congress made sure that the maintaining organization, the one with control over the funds and the administration itself, has to be religiously affiliated. I mean, this is a tricky question, but is this the question that was decided by the courts of appeals, and is it the question that we agreed to review? No. No. So on remand, they have an argument that, assuming we win and that there's no formal requirement that the church establish the plan, that the maintaining organization in this case, these retirement committees, don't qualify. But I do think it's quite important to understand that, Justice Ginsburg, when Congress was drafting this maintaining by a PPO, or principal purpose organization, it was merely defining exactly what before and after 1980, and regardless of the church plan context, what every employment pension plan in America looks like. They're being maintained by either a separate retirement committee or a separately incorporated retirement committee. Now, the other, what I think, Justice Alito, they were trying to say it's anomalous that a plan could be established by the hospital, but it has to be run by, you know, an internal committee that's either controlled or affiliated with the church. But the anomalies are exponentially, you know, monstrous on the other side. Justice Ginsburg, in their view, Congress entrusted a pension board to have control over all the administration and the funding, but didn't allow it to establish the plan, which is absurd given the historical context that pension boards were both establishing and maintaining. The other thing that's anomalous about their proposal is it leaves out in the cold the nuns, and it assumes that Congress rebuffed every religious denomination in America who complained to Congress about how the IRS had been interpreting this provision. And so what the IRS had done in 1977 is it looked at a, it was attempting to define what constitutes a church, and the IRS ruled that because nuns were not, two orders of Catholic nuns were not the church when they were caring for the sick, their hospital plan could not be covered. Sotomayor, Ms. Blatt, I'm putting aside that purpose. Do you think Congress had in mind a corporations that are essentially like every other corporation except they're not-for-profit? I mean, these hospitals, some of them like Dignity, the Catholic Church has disavowed any formal affiliation with it. Blatt. Let me just go ahead. If that, if that, do you think that, I understand the nuns, but you're talking now about an extreme term. Well, the nuns established Dignity and a priest established St. Peter's, or a bishop rather. So, but let me just get back to the planted issue in 1977. Nuns may have, but they no longer are affiliated with the church. I'm happy to argue the facts of Dignity, and we can, I mean, that is an argument the other side on remand. But the place where Congress dealt with your concern about the institution that's not religious enough was not with the establishment, but C-4 requires any church plan that's, that's being maintained by these affiliated organizations to have common bonds and common religious bonds and convictions. Now, Dignity itself has that in spades. It has six orders, not one, not two, not three, not four, not five, six orders of women religious running its Mission Integrity Committee. I'm not going to fight over that. Okay, well, Dignity. But let's go back to my basic question. They're not doing anything different than any other hospital or care center. They are competing. They're the fifth largest health care provider in the nation. They have 60,000 employees. Do you believe that Congress's vision was to let what is essentially a corporate entity opt out of protecting all of those employees? I mean, the Roman Catholic Church is itself, I assume, some sort of corporate entity. But let me get to the bottom line here. If you read Paul Clement's brief filed by the Catholic Church itself and the brief filed by the United Church of Christ and the Evangelical Lutheran Church of America and the Seventh-day Adventists, that's four churches, your decision applies to big and small, medium, extra-religious, non-religious. So whatever you think of Dignity, and I have no doubt that it's both, it has both sides. There's nothing about the size of this. We know Congress had in mind a hospital plan. The word hospital appears on every page of the legislative history. Roberts. Ms. Blatt, I'd like to get to your question about the point you raised early on about the significance of the interpretation of the IRS, the Pension Benefit Board, and what's the other one, the IRS? Department of Labor, IRS, and the Pension Benefit. What are the limits of that proposition? I mean, I don't quite understand. You're saying because these three government agencies interpreted the statute one way, we shouldn't be more we should be inclined to interpret it that way? Yes. I think that reliance is an important reason why you should defer under Skidmore. Well, I guess maybe it's that I've never understood Skidmore. To me, anyway, as it's been articulated, it seems to be the principle is you should defer to agencies when you agree with their interpretation. And I don't see. Yeah, well, Skidmore says that. I mean, the statute means what it means, and it's nice that these agencies have interpreted it your way, but I think we have to go back and interpret the statute ourselves. Of course, but, I mean, Skidmore is still a decision, and it says what you said, but it says anything you find persuasive. But the IRS. But why should it be persuasive? I mean, you faulted, I think, the courts of appeals. You described their opinions as thinly reasoned, but that GCM has started it all from the IRS is certainly thinly reasoned. So let me go back to what our argument is under the IRS. They prompted the amendment by trying to say what a church was. Congress responded not by telling the IRS what the church was or that the nuns were the church, but by making that question irrelevant. The IRS objected and immediately after the law was passed started reverse course on the very nun planet issue here. But let me get to the reason about Skidmore what this case is about. In just two of these cases, Mr. Chief Justice, the Respondents seek $11 billion I am not kidding, $11 billion per year. That's $66 billion in two cases if ERISA's 6-year statute of limitations applies. The risk that the other side could recover even any fraction of that amount is reason enough for you to make sure that the IRS's decision is somehow unreasonable that would jettison 30 years of settled expectations. Well, quite apart from the IRS, the Respondent says, tells us there were I assume hundreds of IRS letters and it was because of this problem that Congress acted. Without getting into the legislative history, which I found totally uninformative, is there why is it that we can give so much weight to these letters when there was no notice and comment regulation? And tell me a little bit about how widespread and well understood the DOL position was. And the Respondent says, oh, the Congress never even knew about these letters, which sounds odd to me. Congress, I mean, every religious faith in America complained to Congress. Congress introduced the bills in response to the religious community. And immediately after, and the Pension Rights Center, that's an amicus, was testifying. It's just silly to think that they didn't know how to use the Internet, at least by whenever the Internet came around and couldn't figure out or go to the library and couldn't read a private letter ruling. But I think the significance is it's not just even the retroactive penalties. Countless plans have been structured around the IRS, the Department of Labor, and the PBG's view. And if you affirm just for all the existing plans that were not established, you're unleashing a torrent of undesirable and unintended consequences, not just for the hospitals. My question is, what can you point to to tell us that the IRS letters were an important part of the motivation for Congress to make this change? Okay. So it was the IRS's ruling under the 1977 Catholic Nun Plan. And 20, I think 20 letters and the Church Alliance representing over 27 denominations, 50 million people, complained bitterly to Congress. I know you don't want to look at legislative history, but every single thing is about how hospitals and church agencies are part of and essential to the church. And the only way, Justice Kennedy, to interpret that is that they were talking about the IRS's definition that because nuns were not performing priestly functions, they weren't the church. And I just think, so the IRS was at the table. The IRS is objecting. The IRS goes home and starts immediately reversing course. And you have the fact that the, I mean, we've talked about the IRS. The other side concedes that another major purpose was to put congregational religions on parity with hierarchical congregations. And we know that the 1974 Act excluded these pension board established and maintained plans. And under Respondent's interpretations, these plans, too, were left out in the cold. We know it's in the 1900s these Protestant pension boards were not only maintaining plans they established, but plans that their church agencies had established. If I could reserve the rest of my time. Thank you, Counsel. Mr. Stewart. Stewart. Mr. Chief Justice, and may it please the Court. I'd like to first to pick up on a point that Ms. Blatt alluded to when she was describing the history of the statute and its amendment. I think the statute in its current form is probably not the type of provision that Congress would draft if it were doing the whole thing in one fell swoop. But it's important to understand that the text of the current provision is the combination of things that were done in 1974 and things that were done in 1980. Congress enacted the original church plan provision. Presumably it had in mind particular plans that were established and maintained by churches, and it covered those. And pretty quickly problems came to light. Other types of plans were found not to be covered by the administrative agency that Congress evidently believed should be covered. And so when Congress amended the provision in 1980, it chose to work within the existing framework. We're not quite sure why, but at least one plausible explanation would be there were some church plans that had been found to be covered under the old established and maintained by a church language. Congress may have wanted to avoid any possible inference that those plans were no longer covered, and so it retained the original language but defined it to include something else. And when Congress passed the provision that Ms. Blatt was discussing earlier, C-1, that refers to a plan established and maintained for its employees, includes a plan maintained by a principal purpose organization. I think it's helpful to recognize that there are two different sorts of definitional provisions that Congress sometimes enacts. Sometimes when Congress enacts a definition, it's trying to clarify what the defined term really means. And when Congress acts in that way, we tend to strain to read the definition in a way that makes it consistent with ordinary understandings of the defined term. But sometimes Congress will enact a provision that says something like, for purposes of this statute, the term State includes the District of Columbia and Puerto Rico. When Congress does that, it's not trying to explain what State really means. It's simply using a shorthand formulation to say, for purposes of this statute, we want D.C. and Puerto Rico to be treated the same way that the 50 States would be treated. And that's really what Congress was doing in the 1980 amendment. When it defined the term, plan established and maintained by a church, to include plans that satisfied the prerequisites in the amendments, it was not saying this is what a plan established and maintained by a church really is. It was saying, for purposes of the church plan exemption, we want these to be treated the same. Kagan. Mr. Stewart, can I ask you about some of the Respondent's hypotheticals, where they offer hypothetical statutes that are very similar in structure to this one, and it's pretty clear that you would read, you know, the ones about disabled veterans and the one about the two presidential criteria, and it's pretty clear that you would read those sentences their way rather than your way. In other words, as just going to one of the criteria. And I'm wondering why you think that's true, that they can come up with these hypotheticals that so clearly should be interpreted their way rather than your way. Stewart. I guess I would say about the hypothetical that is used most often, person disabled in a veteran includes a member of the National Guard. I think if you read it absolutely literally, you would still say a National Guard member who is not disabled is covered. Now, I think the other one. Kagan. I mean, that would seem ridiculous, right? Stewart. I think the instinct, the context would be such that courts would assume, I believe, that Congress had simply made a sort of Scrivener's error, that Congress had used language sloppily. Part of that has to do with the instinct that I alluded to earlier. That is, we would tend to regard a provision like that as one in which Congress was really trying to explain what the term person who is disabled and a veteran means. And so we would strain to read the definition in a way that made it consistent. If Congress passed a statute that said something like, person who is disabled and a veteran shall include any Federal employee with 30 years or more of service, at that point we would understand Congress has just abandoned the effort to explain what person who is disabled and a veteran actually means.  I would think that the way that hypothetical works, it's sort of we're setting these two criteria, you have to be a veteran and you have to be disabled, and then we're going to say there's a special case of veterans. We also mean to include National Guard folks, and that's not disqualifying the fact that it's a National Guard folks. But the two criteria are still the two criteria. All we're suggesting is that it's not disqualifying that you're a National Guard. And you could read this language similarly. It's not disqualifying that it's maintained by a different kind of organization. Stewart. I guess all I would concede based on these hypotheticals is that sometimes a provision that is structured in this way will give rise to the natural inference that Congress wanted to do something other than simply deem a particular thing to fall within the whole defined term and that it had in mind a part. But I think in construing this provision, it may be helpful to look at page 24 of the government's brief, which explains, which kind of clarifies something that Ms. Blatt was referring to earlier, that on page 24 of the government's brief, we lay out the way in which this amendment changed from the time it was first introduced in 1979 to when it was enacted in 1980. And as the questioning in the first part of the argument explained, the original introduced provision said, a plan established and maintained by a church shall include a plan established and maintained by a principal purpose organization. And so the words established and appeared two places in that introduced provision. And as we agree with Ms. Blatt, that the most likely explanation for what caught by Congress took out the second established and was that it was worried about plans that would fall between two stools, a plan that was established by a church but maintained by a principal purpose organization. That would be the hypothetical would be like this case, or this case would be like the hypothetical if the requirement that the plan be established by the church was absolutely critical as the requirement that the individual have a disability is absolutely critical in the hypothetical, which gets to the question, what is the significance in practical terms of a plan's being established by a church? Now, Mr. Feldman says that an entity that establishes a plan is financially responsible for paying benefits under the plan if the plan is unable to do that with its assets, but you say that's not correct. Is that right? Stewart. That's not correct. I mean, in the typical ERISA case, you will have a plan established and maintained by a single employer, and that employer will be responsible for making good on the promises, and that employer may be a defendant in a suit if the promises are breached. But that doesn't mean that the entity that establishes the plan qua establisher  If in particular the entity that establishes the plan is financially responsible that remains ongoing responsibility. But first, there's no reason to think, even if you applied ERISA standards, that a church that established the plan but then left the administration of the plan entirely in the hands of somebody else could be held liable under ERISA. Second, the whole point of the church plan exemption is that plans that qualify will not be regulated under ERISA at all. They will be regulated under state law. So if a church, in order to satisfy this requirement, established the plan and then left its maintenance to somebody else, whether the church would have any ongoing liability would depend on state laws that might vary around the country. So Congress can you tell me what provision of ERISA, and I'll ask Mr. Feldman the same thing if I have a chance, what provision of ERISA explains which entity, if any, is responsible for paying benefits if, for example, a defined benefit plan is unable to do that with the assets in the plan? Stewart. I don't believe there is a provision of ERISA that spells that out. My understanding, and I'm sorry I don't have the statutory cite, is that there is a provision of ERISA that authorizes the plan beneficiaries to sue, but it doesn't specify who the defendant should be. And so the courts have devised tests and approaches to determine in particular cases who the proper defendant is. And to some extent, that will depend upon the way the plan itself is constructed. That is, the plan may say that the responsibility for doing certain things is that of the employer, for doing other things it may be that of the insurer, and so the proper defendant may determine on where responsibility is allocated under the terms of the plan. But so I agree that one big difference between this case and the hypotheticals is the hypothetical is constructed in a way that suggests disability has to be crucial to entitlement to benefits, whereas here there is no reason to think that Congress in 1980 regarded church establishment as crucial to the exemption. And the point I was trying to make about, was going to make about. Kagan. Well, but I guess that's the question, right? And the structure is the same. Stewart. I guess the point I was going to make about, if I could finish this.   About the way in which the statute changed from introduction to final passage is that everyone agrees that Congress could have more clearly achieved the objective that Respondent says they were trying to achieve if it had said a plan maintained by a church includes a plan maintained by a principal purpose organization. And so the idea seems to be Congress was just a little bit careless in leaving in established and maintained at the beginning. That seems particularly implausible given the care they took to knock out the second iteration of established and in the same provision. Thank you, counsel. Mr. Feldman. Mr. Chief. Mr. Feldman, I have a starting question, which is I'm torn. This could be read either way in my mind. If I believe that, what do I go to to break the tie? I think if you look at what Congress was trying to do, this is what I would say. If you accept their view, what you end up with is a statute that doesn't fit what Congress enacted at all and creates anomalies that are impossible to explain. And for those reasons at least, as well as the fact that Congress was very jealous about creating exemptions to ERISA. ERISA covers every private employer, every nonprofit, every hospital in the country, and there's only one category, except there's only one category excluded, and that's church plans. And Congress actually defined church plans carefully. They wanted a close tie between the church and the plan because their purpose was they didn't want to get involved in church affairs. And so they said church plan has to be established and maintained by a church. It needs to fit both criteria because we want, if there's church involvement here, we want hands off. If there's no church involvement, though, there's no reason why these hospitals, like any other hospital in the country and like every other firm in the country, shouldn't have to provide the employees with the pension insurance to protect them against the possibility that when the plan goes bust, they end up with nothing. Roberts. Roberts. Didn't Congress provide for church involvement by making the employees covered by the principal purpose entity church employees? No. It's actually – well, I would just – no, it didn't actually. The statute actually doesn't say anything about the principal purpose entity. So there's three different kinds of things we're talking about here. There are churches themselves. There's principal purpose organizations, which are organizations that are in the business of just giving employee benefits. I mean the church agency employees. Right. And the church – what it said was, yes, it was facing a problem in 1980, which was the original statute said if you're a church, you can cover not only your own employees, but you can also cover the employees of your church agencies. That's what the original statute said, but only until 1982. And that is what everybody was objecting to, and that's why people were – people were objecting to the withdrawal of that sunset provision that was going to happen in 1982. And the reason why they were talking about agencies are very closely related to churches, that was not – it was not to say – their view is Congress wanted to allow fission. They wanted these agencies to split up – these plans to split apart, and the agency to have their own plan and the church to have their own plan, and that's what they said was the opposite. They wanted to allow churches to continue as they had been to provide – to have a plan that would cover both the church's employees and the agency's employees. And they were interested in continued fusion. They weren't interested in fission. And actually there's nobody anywhere who talked about this statute who said, well, what we really need is to allow another whole class of private entities to establish their own plans. So in the provision that Your Honor referred to, they say, well, the employees of the church-associated agency will be deemed to be employees of the churches. Congress passed that provision to solve exactly the 1982 problem, okay? A church plan has to be established and maintained by a church. This is in A, which was left unchanged. Established and maintained by a church for its employees. And then in the original statute they said, well, we don't really care whose employees they are, but you can also cover the church agency. Roberts. If that were so evident, why do the three government agencies responsible in this area, the IRS, the Department of Labor, the PBGC, why for 30 years did they take the opposite view? Well, it's – they took this view in the early 1980s at a time when they were facing one or two – I'm not sure they knew at the time when they started down this road what it was going to lead to in terms of the hundreds of hospitals and other businesses that are going to be able to just deprive their employees of ERISA benefits. But if you look at – But it led to hundreds of letters from the IRS. Is that an exaggeration or is that – No, that's true. Aren't there hundreds of IRS letters approving – That's true. And actually the first – the mother of them all, which was the general counsel memorandum from 82 or 83, it says, this may not be relied upon or cited as precedent. And the statute that authorized all these private letter rulings, which were all done on an ex parte basis and without the opportunity – But nevertheless, it shows that an entity that had one of these plans where there was some doubt was proceeding in good faith with the insurance – with the assurance of the IRS that what they were doing was lawful. Yes. And that entitled them to exactly what it was supposed – the government had that this may not be relied upon language because it didn't want to be bound to this. That's standard language in a private letter ruling, isn't it? Yes. Okay. So it's nothing special about this. But when this goes on and on, quite without reference to the legislative history to which Senator said what, which I think is unhelpful, we do know that the climate, the culture, the economic problem after 30 years was that many of these associations which had proceeded in good faith based on the IRS were at risk of tremendous liability. And that's certainly a reason for understanding, A, why Congress acted, and, B, the problem it wanted to solve in the way the Petitioner said it did. Your Honor, I don't think that that's right. So these cases are about primarily, overwhelmingly forward-looking remedies. They're about bringing these plans into accord with ERISA, to getting insurance for these plans so that their employees can be sure that they get their benefits when they're supposed to get them. But was Ms. Blatt incorrect when she said that the complaints seek billions of dollars in penalties? Right. The complaint we don't know all the facts of these cases. But I, what those. What's the answer to my question? Yes. They, well, they, they don't actually, I don't believe they name a dollar figure for the penalties. Well, they, if you figured out the penalties, would they be billions of dollars?  No one has ever. Then how can you say that this is primarily about forward-looking things? Because I think that everybody admits in this case, not only everybody admits, the statute, the authority to issue penalties is in the district court's discretion. And the, the, nobody has ever, no court has ever, I don't think, issued, had an ERISA penalty close to that. And this Court has repeatedly emphasized that when you're addressing a remedy under 502a3 or 502c3, you're supposed to take into account the equities of the situation. And so if you. And one equity would be the reliance. One, a court might well say, well, we read the statute the way the courts of appeals have, but we're not going to give you any retrospective relief because you legitimately in good faith rely. I, I completely agree. The, the good faith of the party is actually a key factor. Well, I understand that, but I, I mean, you said that this is primarily, well, don't worry about the penalties. This is primarily about forward-looking things. And yet the complaints ask for the penalties. Are you willing, on behalf of your clients, to disavow any requests for penalties? No, I'm not. Then how can you say that it's primarily about forward-looking remedies? Because I can say that because we don't know the facts of this case. I'm willing to say that if all the facts suggested that they acted in good faith throughout and just made a mistake and they couldn't have been expected to do anything  Well, they had whatever, whatever, whatever reliance was reasonable based on these hundreds of letters. That's one thing. How about relying on the literal meaning of the central statutory provision? Yes, and I think that the literal meaning of that, as all three courts of appeals unanimously agreed, the literal meaning of that was, this is not a stand-alone statute that says, you know, there are statutes in the U.S. Code that say, that don't define a term, and then they say, but a felony includes something or other, okay? They don't define felony. They just say a felony includes something or other. That's one kind of statute. And then courts are supposed to figure out what else a felony includes. But this statute doesn't do that. And, in fact, the language at the beginning of C-1, a plan established and maintained by a church, ties it to this. You actually can't read C-1 as a stand-alone statute because it wouldn't make any sense. It ties it to A. Alito, the literal language of C-1, and you're now talking about everything else, the literal language of C-1 says a plan established and maintained by a church includes a plan that is maintained by a principal purpose organization. And it's as simple as that, that read literally, it is not required that it be established by a church. Now, you have other arguments, but I just, Your Honor, respectfully disagree. The court, if the court has said one thing more often than anything else in the context of statutory interpretation, it's that you have to read things in context and you have to read statutes as a whole. And this C-1 has language that ties it directly back to A, which Congress said in 1980, we are retaining A the way it is. And I think you have to read them both together. If you read them both together, what you say, the basic form is, whether it's the example of the disabled veterans, the President, or the examples that they give in the Supply Brief, the basic form of this is if you have a statute that says, here is a rule that applies to A and B, and then it says A and B includes a particular kind of B, which is what this says, right? Established and maintained includes a particular kind of maintenance, then that is naturally taken to mean, well, we are expanding or clarifying the B, but we are not doing anything to the A. Kagan, Why would you repeat the requirement of the A? In other words, Congress could have just said, a plan maintained by a church includes a plan maintained by one of these organizations. And that's a question, so another way of asking the question is, under your interpretation, established and have no function? I actually don't think that that's quite right. They could have worded this other ways. They certainly could have worded the statute many other ways to accomplish Respondent's position, Petitioner's position. But this, the point of repeating that language was directly to tie it, it was one way, to directly tie it back into A and say, okay, now we are talking about these things, we want to include a particular kind of B. Now, that is, one thing to note is, it's not B, it doesn't say, I mean, Petitioner has no answer for this at all. Why Congress wanted to have, require them to have a principal purpose organization at all, churches don't have to have that, and why did Congress trust them to establish their own plans and then say, but we actually, you can establish your plans, Dignity Hospital, but you don't have to maintain the plan, you can't maintain, we are prohibiting you from maintaining your plan, you have to go to a principal, an agency that is principally involved in dealing with employee benefits that otherwise satisfies the requirements, and you have to have them maintain it. And there is no ---- Roberts From your perspective, what is the practical significance of requiring that the, excuse me, plans be established by a church? I think the practical significance is, Congress's purpose here, and again, I don't think this is in dispute and there is no other purpose that has been suggested, was hands off the church. If a church is involved with a plan, we don't, we don't, we want to have, leave them the freedom to be outside of ERISA. But there is no church involved. When there is no church involved, as there is in this case, the church has no direct involvement. Roberts Well, but you began with that, and the church is involved to the extent, the law says that the principal purpose is, agency is maintaining that fund for people who are defined to be church employees. So you can't say the church is not involved in that, in the situation before. No, actually, I think you can, but what I'm saying is the church itself, these employees who are so defined are actually employees of the church agency, but the church itself has no, has zero involvement with this plan. There is nothing that says the church shall be deemed to have established the plan or the church. These plans have zero involvement with any church. They don't have any. Roberts But they have involvement with the church agency, right? They do. And so I thought the whole concern with the original IRS problem was that the IRS was treating church agencies as if they were not engaged in a church function. They were saying, okay, the church has an agency whose mission is to, you know, feed the hungry, clothe the naked, all of that, and the IRS was saying, well, that's not a church. It's got nothing to do with it. And now it's changed, and those individuals who are engaged in that social mission are treated as members of the church agency. They are treated that way so that the church agency, they are, they are doing that so that the church can include them in its plan if they want it. And that, if the church wants to do that, that's fine and they can do that. But, but they're not, the point of that provision was to eliminate the 1982 cutoff that wouldn't have allowed the church, the churches to continue to do that. And the church is- Mr. Feldman, let's go to that 1982. Tell me how your reading of this statute includes the organizations that were clamoring and for whom the IRS had said were covered by this provision. The pension boards that were separate from the church, and Ms. Blatt pointed to the sisters, the, the nuns who were also seeking coverage. How does your reading take care of those two situations facing Congress? I, I think it actually perfectly matches with those two situations. The C2 and C3 provisions, as I said, they allow churches to continue if they wanted to cover church agencies, eliminated the 1982 cutoff that people were concerned about. The C1 provision said, that was not a provision about, let's drastically expand the types of entities that are, and by millions of employees, the types of employees who don't have ERISA protection. This was what Representative Conable termed a technical problem. But I would have thought that the one thing that seems most clear from a pretty murky legislative history is that church pension boards were supposed to be included in this. And the church pension boards, some of them were established, their plans were established by the church. Some of them not. So you would be taking out some of these church pension boards that I thought are the sort of quintessential group that this was designed to include. I, I really, I disagree with the premise of that. If you look back, you know, no, there's nothing in the legislative history that said there were anybody, there's, let me say this correctly, you know, there's a few stray references in letters from pension boards saying, yeah, we established a plan. But we actually go over each of the ones in our brief, and each of the ones that they cite, and they're actually, Congress had no, that was not the way they operated then, it's actually not the way they operate now. The way they operate is, these are for congregational churches primarily. And in a congregational type of setup, you have an assembly or synod of the church itself. And this is just an assembly of all the local churches, and they, they will establish the plans. If they don't have the on- Ginsburg-What does it mean to establish a plan? Establishing is all important in your view of it. So, and I didn't see any statutory definition of what it takes to establish a plan. And I, as this Court's Fort Halifax case, I think, established it, it means making a commitment to provide some kind of reasonably definite benefits over, to, in, under, to some employees, you know, reasonably well defined. That's what it means. If you don't make that commitment, if you say, if the church said, we want somebody else to have a plan, and laid out what the terms would be, actually, the church would definitely not have established a plan. It would be somebody else who, if they took them up on it, would. But for the church to establish a plan means it, I mean, this case is actually, the Dignity case is a perfect example. The district court here, and it's not usually a difficult inquiry, the district court here found, and if you look around page 56A of the cert petition appendix in the Dignity case, the district court said, well, who established this plan? Well, Dignity, the hospital, they passed a corporate resolution and adopted a summary, the appropriate corporate officers adopted a summary plan description, and they established the plan, and that committed Dignity to doing certain things. And it wasn't somebody else who did it, and that's usually what that inquiry is. You need some kind of commitment. Now, Congress, when that kind of commitment was made by a church, Congress said, we want hands off, and they had good reasons for doing it. It's very much like in the tax code. There's numerous other places where you have to distinguish between churches and church agencies. In section 26 U.S.C. 7611 gives churches quite extraordinary protection against audits, against the circumstances under which they can be audited, the types of things that can be looked at, and the rights they have during the audit. It applies only to churches and not to agencies. And the principle was the same principle here. We don't want the government looking into the books and records of churches. And I think that was part of the reason why the government didn't do it. Alitoson Well, in the situation where the church establishes the plan and then turns over the maintenance of the plan to a principal purpose organization, the audits would be the books of the principal purpose organization. There wouldn't be very much to look for in the records of the church. So if that's the – if that was the purpose of it, I don't see what the establishment required. Roberts I would think that it's more than just looking at the books and records at that particular time. There can – when the church is establishing a plan, it's making some kind of commitment of what kind of benefits, who's going to get and when. That's what it means to establish a plan and how it's going to be funded. And you might – Alitoson Where do I look to find that? And where do I look to find the provision that says what you say, which is that the entity that establishes a plan is financially responsible? Roberts The financial – it's financially responsible to the extent that what it says when it establishes the plan. I mean, I suppose, especially if it's not subject to ERISA, it can limit its liability. Alitoson It's responsible to the extent the plan makes it responsible? Is that the answer? Roberts It's – under ERISA, plans can't limit their liability. But, I mean, the parties establishing plans can't. But under – if it's not an ERISA plan, they probably can have provisions that say we're only going to give you what's – the money that's in the plan. Alitoson Well, where's the provision? Roberts But they still have to make a commitment, and that would be governed, presumably, in the case of a non-ERISA plan by State law. But if I could go back to the point you made earlier, where's the provision of ERISA that supports what you said, which is – it seems to me to be a significant point, that the entity that establishes the plan is financially responsible for the plan. What is the provision of ERISA that says that? Roberts It's – I think it's – I can't cite it to you right now, the number, but it's the provision that says you have to carry out the terms of a plan. And what a plan – Roberts I thought Mr. Stewart suggested the opposite. Roberts No, he – I don't think so. I think he said the employees can sue. If it's an ERISA plan, you can sue under 502 for whatever the benefits are that you've been promised. But – Roberts So it's to the entity establishing it or the entity maintaining the plan? Roberts You could – first of all, frequently they're the same. But if they're different, it certainly could be. Roberts In this case, they're not, right? Roberts In this case, I think they are, actually. Roberts Well, you're talking about – I thought the principal purpose agency is the one, the entity is the one that's maintaining it. Roberts Right. And the principal purpose agency in these cases is an internal committee of Petitioners. So I don't think there would be any difference in suing – I think you would sue Petitioners. That's all that – there's nobody else to sue. But I guess you would sue both of them, actually. Ginsburg Is – can an internal committee of a church-affiliated organization qualify as a principal purpose organization? Roberts We believe that it can't. And, in fact, there would be no reason at all for Congress to have required – according to my friend, Congress wanted to be sure that whoever's maintaining the plan is somebody who's associated with the church. But there was no reason to talk about principal purpose employee benefit organizations that are primarily involved in employee benefits if that's what you wanted to accomplish. The – this makes sense if you look at it as something that congregational denominations were doing as of 1980, which is they found it convenient to have the maintenance of the plan done by an organization that was an employee benefits organization. And nobody objected to that. They said, that's fine. Mr. Halperin didn't object to it. Nobody did. That's fine. If you want – if that's a convenient – they were talking about how to run a plan, not opening up the plan to a broad range – not opening up the exemption to a broad range of plans and probably millions of employees. And just back to the – Breyer How many – how many employees did come in under the IRS interpretation for 30 years that wouldn't have come in had the IRS followed yours, if you know? About. Just a rough answer. Roberts I would assume all of them. Breyer No, no. I mean, I'd like to get a rough idea of what you're – we're talking about, because your argument practically depends on, if we keep following the IRS interpretation, there'll be vast numbers of plans that come in that wouldn't otherwise. They followed it for 30 years. I'd like to get a rough empirical idea of how many have come in because they didn't accept your interpretation, how many employees are exempt that wouldn't have otherwise been. Roberts Right. They say that there are a million employees that have been in these plans. Actually, though, there's probably millions of more employees in the future. Once this Court reaches a decision, that would be the case. Breyer Why? Why won't they be kept out by the principal purpose definition unless they really are the little sisters of the poor? Roberts They wouldn't be kept out any more than Petitioners in this case would be. I mean, it would be the same. Breyer Well, that may be, but there's an issue as to whether Petitioners in this case, which ones come in and which ones don't. Roberts Right. But I think really the point is that there's a lot of them. Breyer The answer is you don't know. Okay. So the – that's at least what I'm getting. I wanted to get a rough idea of the scope of the practical extent of the two interpretations. And I think the answer is you don't know. Roberts Well, I don't – we haven't – all these cases haven't been litigated and I can't say how they're all going to come out. Breyer Okay, fine. I want to know another thing. I have another thing I want to know. The Catholic Church establishes the plan. The little sisters of the poor maintain it. On your definition, is it in or out? And the exemption – or the exempt not? Roberts If the little sisters of the poor under the – Breyer I'm assuming they're a principal purpose organization. Roberts Yes, then it would be in if they're a principal purpose organization. Breyer Okay. Second, the little sisters of the poor establish it and the little sisters of the poor maintain it. On your definition, are they in or out? Roberts They're out because – Breyer Okay. Third, in – it is established by a municipality and it goes broke and the little sisters of the poor say we'll run the hospital. In or out? In or out of the exemption? Roberts I believe that would be out. Breyer Out. Okay. So you actually have to have the Catholic Church establishing itself. If it's established by the little sisters of the poor, it's out. Roberts That's right. And the reason is because Congress – what Congress was most concerned about here was not going into the church's books and records. These agencies like Petitioners, their books and records are open to the public. They're open to Medicare, Medicaid and everything else. Breyer That's true, but I mean if it's a legitimate organization like, say, the little sisters of the poor, really affiliated with the church, you know, really affiliated with the church, they do have a lot of information. Roberts And if they really are part of the church, I would add one other thing. If they really are part of the church and they can qualify as a church, that's fine, they can. This line between churches and church agencies is one that gets drawn throughout the law, it gets drawn in seven or eight provisions of the U.S. Code. Roberts I thought the whole purpose was to avoid that inquiry, or that was the mistake that the IRS made, is that it was saying these church agencies were actually not part of the church because they weren't engaged in sacerdotal or what other activities that they, IRS, thought characterized what a church should be. Roberts I just don't think that that's what the problem was. The problem was that they were facing a 1982 deadline after which church agencies would not have been able to be in a plan no matter who did what for anything. And they wanted to do something about that. Roberts What was the tenor of the hundreds and hundreds of letters that Congress received about what the IRS was doing? What did they understand the IRS to be doing? Roberts If you look at the 20, on page, I think, 10,054 or so of the Congressional record, I don't remember the volume number, but it's cited by Petitioners and by us, there are 20 letters that Senator Talmadge put in the record. I looked at them. Of those, six of them use the term internal revenue service. But the internal revenue service at that time was promulgating regulation. This is not about the Little Sisters of the Poor. None of them mention that. In fact, there's no mention of the Little Sisters of the Poor, the sisters who had the plan in New Jersey. There's no mention of that at all. Alito Are you saying that the only purpose of the amendment was to avoid the sunset provision? Roberts I think there were two purposes. The C-2 and C-3. Alito All right. So that avoiding the sunset provision was not the only purpose. I think that's what you just said a couple minutes ago. Roberts That was okay. Excuse me. I didn't mean to say that. What I meant to say is the purpose of the C-2 and C-3 provisions, which was completely accomplished, was to get rid of the sunset provision. And these letters are overwhelmingly about the sunset provision. And every time Senator Talmadge or anybody else said, well, we're, you know, the churches are, these church agencies are very closely tied to the church. They're really, it's part of the church. Every time he was talking. Alito They obviously wanted to do something else, right? And that's what C-1 is about. Roberts And the other thing they wanted to do was what Representative Conable called a technical problem, which is they wanted to enable church, these congregational churches to maintain plans in a different way than they had been, to maintain plans through this separate agency, because that was the way they found it most convenient to do. And that actually explains this language of why they're talking in the first place about principal purpose agencies and why that doesn't apply to the churches can establish and maintain a plan, and that's fine. Sotomayor Mr. Gelman, why do you think, I mean, I have read all your arguments about why the IRS letters are not entitled to deference, but I come at it from a different point, which is it was in part these private organizations, religious organizations, but the IRS too, who was lobbying Congress to express itself on this issue and take care of what the IRS knew was a problem for all these people. And then all of a sudden, almost immediately after the legislation is passed, the IRS is believing and stating that it's done more than you claim. Isn't that in itself evidence, not the Skidmore deference, but evidence that the agency believed that the answer was different than you're promoting right now? I, you know, the agency did believe the answer was different. That is in the letters. There's no reasoning, actually, in those letters at all, and insofar as there is any, it's wrong. Except they knew there was a problem. They thought or they assumed. And they were faced. Sotomayor, rightly or wrongly, they assumed that this language fixed it and fixed it how they were describing it in these letters. They, they, they did interpret it the way they did. I wouldn't deny that they did that. But they'd give no reason for doing that. These were ex-party letters. Every one of them up until the last couple of years was done on an ex-party basis. The competitors had no chance to say this is what we think. The employees had no chance to say this is what we think. They didn't analyze the importance of ERISA provisions. They didn't analyze what would inevitably did happen, which is there are six or seven church plans already that have failed and left the employees with nothing that had they been covered by ERISA, they would have had PBGC insurance. The IRS didn't take any of that into account at all. And, you know, they were just wrong in 1982. And, in fact, it's hard to, it's clear one part that they're wrong that we talk about in their brief. But it's hard to see what other reasoning they have about why they didn't consider the practical consequences of this. They didn't consider the history of it. They didn't consider the relationships between the A and the C-1 provision. They just didn't consider what any of the particular words of the statute meant. They really didn't do any of that. I would like to make one other point on reliance, which is, you know, this is about bringing these plans into compliance with ERISA. That shouldn't be a hard thing to do. And a district court should be able to do it giving them whatever period of time is reasonable. That's the overwhelming thing that's at issue here. And, in fact, if, as they say, they haven't departed from ERISA that much, which we don't believe, then it should be particularly easy to bring them into compliance with ERISA. The only two things that are backward-looking at all are the civil damages, which I may have to adjust some vesting schedules between 3 and 5 years, which is likely to be a minor problem. Roberts. Thank you, counsel. Two minutes, Ms. Black. So I'm just going to start with the funding issue. The one thing that's pellucid about C is that the church does not have to fund C-1 plans because the statute explicitly allows the maintaining organization to fund it. And C-1 moves maintenance outside the church, which means the church are absolutely off the hook. They also, you know, they raised the dignity plan. The sponsoring congregations did establish those plans. And the other side argues the sponsoring congregations are not the church. And I guess that's because they're not priests. The other thing I would ask you to read is the brief by the United Church of Christ and the Evangelical Lutheran Church of America. They explain that the centralization that an establishment requirement would impose is anathema to their religious beliefs. And it's the same reason the maintenance is. It's a continuum. Establishment and maintenance. Establishment turns on day one, and then day two, throughout time immemorial, they're being, the other side concedes you can maintain them. But the notion that there is some umbrella church for the Jews and the Protestants is just, it's fantastical that could possibly establish these plans. The other thing I wanted to mention, the other side keeps talking about these closely tied joint plans. But the only other thing we know that's pellucid about C is that an exempt plan can cover every single employee in this country for a religious non-profit institution. And not a single church employee needs to be in that plan. The other side is asking you to engage in a counterintuitive kind of weird thing that a church would set the dental plans and the vesting requirements for employees of a affiliated organization, especially in a place like the Jewish and Protestant religion. And that just is not credible. And finally, on the anomalies. I mean, they have the anomalies of the pension board, they want to divorce the establishment from the maintenance. They have the anomaly that the nuns are left out in the cold. They have the anomaly of the YMCA, and I see my time is up, I don't want to. You can finish your sentence. That the YMCA is the only, you know, religious organization in America that got this exemption. And they have this sort of silliness that a church would establish plans for someone else's employees. Thank you, counsel. The case is submitted.